# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF HAWAII

| | |
|---|---|
| In re<br><br>JAMES WILLIAM LULL,<br><br>     Debtor. | Case No. 06-00898<br>Chapter 7 |
| ——————————————<br><br>BOWERS and MERENA AUCTIONS,<br>LLC, a Delaware limited liability<br>company,<br><br>     Plaintiff,<br><br>vs.<br><br>JAMES LULL, an individual; KAPAA<br>382, a Hawaii limited liability company;<br>GREGG GARDINER as trustee of the<br>GREGG C. GARDINER REVOCABLE<br>LIVING TRUST; and DANIEL<br>YAMAGUCHI, an individual,<br><br>     Defendants. | Adv. Pro. No. 07-90026<br><br><br><br><br><br><br>Re: Docket No. 63 |

## OPINION CONCERNING
## MOTION FOR SUMMARY JUDGMENT

## I.    INTRODUCTION

This is an adversary proceeding in bankruptcy. Fed. R. Bankr. P. 7001.

The complaint seeks interpleader relief. Fed. R. Civ. P. 22; Fed. R. Bankr. P. 7022.

Before the court is a motion for summary judgment by Defendant Gregg Gardiner, as trustee of the Gregg C. Gardiner Revocable Living Trust ("Gardiner"), one of the claimants to the interpleader fund. Fed. R. Civ. P. 56; Fed. R. Bankr. P. 7056.

Plaintiff Bowers and Merena Auctions, LLC ("Bowers and Merena"), is in the business of accepting consignments of rare coins and other collectibles, which it offers for sale, by auction, to the general public. Defendant James W. Lull ("Lull") is the debtor in the underlying chapter 7 liquidating bankruptcy case. Ronald K. Kotoshirodo ("trustee") is the trustee in bankruptcy in Lull's case. By amended order dated October 1, 2007, the trustee was substituted for Lull as a party defendant. Defendants Gardiner, Kapaa 382, LLC ("Kapaa 382"), and Daniel Yamaguchi ("Yamaguchi") are creditors of Lull.

## II.    FACTS

On April 21, 2006, Lull entered into a consignment agreement with Bowers and Merena for auction of his Standing Liberty quarter-dollar collection on August 18, 2006. On April 21, 2006, Bowers and Merena also agreed to, and did, loan to Lull the sum of $700,000, the loan to be repaid from the auction proceeds.

The collection sold at auction for $1,119,750. After repayment of its loan to Lull and expenses of sale, Bowers held net proceeds of $455,046.11.

-2-

Gardiner, Kapaa 382 and Yamaguchi have all advised Bowers and Merena that they are entitled to the auction proceeds.

Gardiner's claim to the proceeds arises from a March 1, 2005, loan to Lull in the amount of $3.8 million. Lull was unable to repay the loan when it became due, on February 28, 2006. In July, 2006, Gardiner agreed to forbear from taking immediate legal action to enforce the note after Lull offered to provide Gardiner with comprehensive security for the outstanding debt. Lull executed a security agreement on July 19, 2006, which granted Gardiner a security interest in "all personal property and other assets" of Lull and specifically listed all commonly known categories of personal property, including goods, accounts, money, chattel paper, general intangibles, instruments, and the proceeds thereof.

Gardiner recorded a financing statement in the Bureau of Conveyances of the State of Hawaii on July 20, 2006. The financing statement described Gardiner's collateral as, "All assets and all personal property of the Debtor (including, without limitations, fixtures), whether now owned or hereafter acquired or arising, and wherever located, and all proceeds and products thereof."

Kapaa 382 made short-term loans to Lull on September 20, 2005, for $933,000; on December 5, 2005, for $471,566.82; on December 15, 2005, for $165,000; and on December 19, 2005, for $400,000. On July 26, 2006, in

-3-

consideration for the loans, Lull executed a "Partial Settlement Agreement" in which he agreed, among other things, to "convey and transfer to [Kapaa 382] title to the Coin Collection currently consigned to Bowers and Merena Auctions, LLC for auction scheduled to occur in August 2006, by Bill of Sale[.]"

Kapaa 382 filed a financing statement with the California Secretary of State on August 22, 2006, but the financing statement listed Kapaa 382 as both the debtor and the secured party and did not mention Lull.

On July 11, 2006, Lull executed an assignment of the proceeds of the coin auction to Yamaguchi, apparently on account of an unpaid promissory note, dated May 16, 2006, in the amount of $700,000. There is no evidence that the assignment was recorded.

On December 8, 2006, Lull filed a voluntary chapter 7 petition. Filed claims in the bankruptcy case exceed $55 million, including unsecured claims of nearly $42 million.


## III.   PROCEDURAL HISTORY

On November 8, 2006, Bowers and Merena filed a complaint for interpleader in the Superior Court of California, County of Los Angeles, seeking to compel the defendants to litigate their respective rights to the coin auction proceeds.

-4-

Bowers and Merena deposited $453,302.26 with the clerk of the Superior Court after deducting $1,743.85 in attorneys' fees from the net proceeds.

After Lull filed a voluntary chapter 7 petition in late 2006, Gardiner removed the interpleader action to the United States Bankruptcy Court for the Central District of California, Los Angeles Division, on March 7, 2007. On May 18, 2007, the California bankruptcy court transferred venue to this court.

Upon removal of this lawsuit to the bankruptcy court in Los Angeles, all parties stipulated that the fund is to remain with the clerk of the Superior Court until final judgment of a court of competent jurisdiction. The stipulation also provides for release of the interpleader plaintiff and payment to plaintiff of $5,000 on account of its interpleader fees and expenses. The stipulation was filed in the United States Bankruptcy Court, Central District of California, on April 18, 2007. Stipulation for Discharge of Plaintiff from Interpleader Action and Allowance of Capped Fees and Costs, Case No. 2-07-ap-01206 (Docket No. 11). According to the stipulation, there are 6 coins which did not sell at the auction. After plaintiff sells those coins, the net proceeds will be added to the interpleader fund.

On October 1, 2007, the trustee, as substituted defendant for Lull, filed a cross-claim against all other defendants, asserting that the transfers to Kapaa 382 and Yamaguchi could be avoided for the benefit of the bankruptcy estate as unperfected

-5-

transfers pursuant to 11 U.S.C. § 544, and that the transfer to Gardiner could be avoided as a fraudulent transfer pursuant to 11 U.S.C. § 548.

Gardiner and Kapaa 382 filed answers to the cross-claim denying the trustee's allegations. In its answer, Gardiner asserted good faith defenses under 11 U.S.C. §§ 548(c) and 550(b)[1] to the trustee's fraudulent transfer claim.

Yamaguchi has not made an appearance in this adversary proceeding.

On December 14, 2007, Gardiner filed a motion for summary judgment as to all claims and all parties in this action, seeking a determination that it has a superior claim to the entire interpleader fund. The motion came on for hearing on January 31, 2007. Wayne K.T. Mau, Esq., appeared for Gardiner; Lora Han, Esq., appeared for Kapaa 382; and Cuyler Shaw, Esq., and Kevin Herring, Esq., appeared for the trustee. After hearing oral argument, the court took the matter under advisement. Upon consideration of the written and oral arguments of the parties, for the reasons stated below, the court will enter an order granting the motion in part and denying the motion in part.[2]

---

[1] Gardiner's assertion of a good faith defense under 11 U.S.C. § 550(b) is misplaced. Gardiner is the initial transferee of the challenged security interest. The § 550(b) good faith defense is available only to subsequent transferees of the initial transferee.

[2] The court has jurisdiction pursuant to 28 U.S.C. § 157(b)(2)(A), (H), (K) and (O), and 28 U.S.C. § 1334(b). This is a core proceeding.

-6-

## IV. STANDARD

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c), Fed. R. Bankr. P. 7056. The party seeking summary judgment bears the initial responsibility of identifying evidence which it believes demonstrates the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The issue of material fact necessary to defeat summary judgment "is not required to be resolved conclusively in favor of the party asserting its existence[.]" First Nat. Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968). Rather, "all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." Id. See also, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).

In a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party. State Farm Fire & Cas. Co. v. Martin, 872 F.2d 319, 320 (9th Cir. 1989).

-7-

## V.    DISCUSSION

Gardiner asserts that it is entitled to the entire interpleader fund as a matter of law because it has a perfected security interest in Lull's coin collection that has priority over all other asserted interests in the collection, and because the trustee cannot avoid Gardiner's security interest as a fraudulent transfer.

Kapaa 382 argues in opposition to the motion that Gardiner does not have a properly perfected security interest because the auctioned coins are "money" and the filing of a financing statement is insufficient to perfect a security interest in money under the Uniform Commercial Code ("UCC").  The trustee argues that summary judgment is inappropriate because there is a genuine issue of material fact as to whether Gardiner's security interest is a fraudulent transfer not within the good faith exception of 11 U.S.C. § 548(c).


### A.    Validity and Priority of Gardiner's Security Interest

The first question is whether Gardiner has taken the proper steps to perfect a security interest in the coins and the auction proceeds.

Gardiner recorded a financing statement that described the collateral securing his $3.8 million promissory note as "[a]ll assets and all personal property of the Debtor . . . ."  Under revised Article 9 of the UCC as adopted by the Hawaii

-8-

Legislature in 2000, such supergeneric descriptions of collateral are permitted in financing statements. Haw. Rev. Stat. § 490:9-504 provides that a financing statement sufficiently indicates the collateral that it covers if it provides "[a]n indication that the financing statement covers all assets or all personal property" of the debtor.

Although a similarly broad description in a security agreement is not sufficient for a security interest to be enforceable, Haw. Rev. Stat. §§ 490:9-203(b)(3)(A) and 490:9-108(c), the security agreement signed by Lull specifically identified every commonly known category of personal property, among them goods, accounts, money, chattel paper, general intangibles and instruments. Under section 490:9-108(b), collateral is reasonably identified if the identification is by: "(1) specific listing; (2) category; (3) [and] . . . a type of collateral defined in [the UCC]." The security agreement signed by Lull identified the collateral by category and also by UCC-defined type. See Haw. Rev. Stat. § 490:9-102. It therefore sufficiently described the collateral to which Gardiner's security interest attached.

Kapaa 382 argues that the filing of Gardiner's financing statement did not perfect a security interest in the coins because the coins are "money," and, under Haw. Rev. Stat. § 490:9-312(b)(3), "a security interest in money may be perfected only by the secured party's taking possession[.]" Although Kapaa 382 has not had

U.S. Bankruptcy Court - Hawaii  #07-90026  Dkt # 105  Filed 02/29/08  Page 9 of 24

actual possession of the coins, it suggests that additional discovery may reveal that Bowers and Merena held the coins for Kapaa 382's benefit and that Kapaa 382 therefore had constructive possession of the coins.[3]

Kapaa 382's argument that the auctioned coins constitute "money" under Article 9 is not persuasive. Coins are not merely "money" where their market value far exceeds their face value.

UCC Article 9 does not define "money," but Article 2, concerning sales, recognizes that "money" can be transformed into "goods" under certain circumstances. The Official Comment to UCC section 2-105 states that, "Goods is intended to cover the sale of money, when money is being treated as a commodity, but not to include it when money is the medium of payment." Although the drafters appeared to have had in mind sales of foreign currency in offering this clarification, the same reasoning applies to sales of numismatic coins where "money is being

_____

[3] Pursuant to Haw. Rev. Stat. § 490:9-313(c),

> [A] secured party takes possession of collateral in the possession of a person other than the debtor, the secured party, or a lessee of the collateral from the debtor in the ordinary course of the debtor's business, when:
>
> > (1) The person in possession authenticates a record acknowledging that it holds possession of the collateral for the secured party's benefit . . . .

-10-

treated as a commodity[.]"

The definition of "goods" in Article 9 specifically excludes money. Haw. Rev. Stat. § 490:9-102. However, it makes little sense to take the narrow view that coins of numismatic value are always money and never goods under Article 9. For example, the old quarter-dollar coins sold at auction by Plaintiff are no longer money that could be used at face value for the purchase of goods.

There is little case law on this issue. However, the cases take the commonsense approach that coins worth more than face value are not merely "money". For example, in Cordner v. U.S., 671 F.2d 367 (9th Cir. 1982), a corporation paid a dividend to shareholders in the form of collectible coins, $20 U.S. gold Double Eagles. The face value was $5,500. The market value was $70,936. The issue was whether, for tax purposes, the dividend was taxable at the face value or at the market value of the coins. The Court of Appeals held that the taxable dividend was the market value, not the face value, of the coins, observing that, "[w]hen legal tender, by reason of its value to collectors or the intrinsic worth of its contents, has a fair market value in excess of its face value or tender, then it should be deemed property other than money . . . ." 671 F.2d at 368.

In In re Midas Coin Co., 264 F.Supp. 193 (E.D. Mo. 1967), the court found that coins that had numismatic value were "goods" within the Missouri statute

-11-

authorizing a secured party to perfect a security interest in goods by taking possession of the collateral without filing a financing statement. In that case, the coins were used in the debtor-coin dealer's business and were pledged as collateral for a bank loan. As the court noted, "The law favors a construction which harmonizes with reason and which tends to avoid absurd or unreasonable results." 264 F.Supp. at 195.

Kapaa 382 contends that <u>McKee v. State Farm and Casualty Co.</u>, 145 Cal.App.3d 772 (1983), compels a different result. In <u>McKee</u>, a homeowner sued his insurance company for breach of contract and bad faith after the insurer determined that a valuable silver coin collection stolen from the plaintiff's home was subject to a policy exclusion limiting the insurer's liability for "money, bullion, numismatic property and bank notes" to $100. The California Court of Appeal held that a commonsense reading of the exclusion compelled a determination that the coins fell within the categories of "money" and "numismatic property." The court stated that, "Limiting the reasonable meaning of 'money' to only that which is actually circulating as part of the currency is not reasonable." 145 Cal.App.3d at 776.

<u>McKee</u> is distinguishable because the policy exclusion at issue specifically referred to numismatic property. Moreover, <u>McKee</u> does not stand for the proposition that collectible coins must always be "money" and can never be "goods" in commercial transactions; it merely observed, in the context of an

-12-

insurance policy exclusion that covered numismatic coins, that "money" includes non-circulating, collectible coins.

Following the commonsense approach of <u>Cordner</u> and <u>Midas</u>, it will be held that the valuable coins consigned by Lull to Bowers and Merena for auction are "goods".

Under Hawaii law, a security interest in goods may be perfected by taking possession, Haw. Rev. Stat. § 490:9-313(a), but otherwise must be perfected by filing a financing statement in the jurisdiction where the debtor is located. Haw. Rev. Stat. §§ 490:9-310 and 490:9-301. When Lull gave the security interest to Gardiner, Lull was a resident of Hawaii. Gardiner, accordingly, properly perfected its security interest in the coin collection by filing a financing statement covering all of Lull's personal property. Under Haw. Rev. Stat. § 490:9-315(a)(2), "a security interest attaches to any identifiable proceeds of collateral." Gardiner's security interest therefore reaches the proceeds of the coin auction.

Because Lull's collectible coins are "goods" under Article 9 and Gardiner had a perfected security interest in the coins at the time Lull purportedly transferred the collection to Kapaa 382, Gardiner's security interest would have

-13-

priority over any security interest held by Kapaa 382,[4] regardless of whether Bowers and Merena held the coins for the benefit of Kapaa 382. Therefore, additional discovery on the issue would be unproductive.

There is no evidence in the record that Lull's purported assignment of the auction proceeds to Yamaguchi was ever recorded, and Yamaguchi did not respond to this motion. Accordingly, it will be held, based on the undisputed facts, that Gardiner's security interest also has priority over any interest held by Yamaguchi in the auction proceeds.[5]

### B.    Whether Gardiner's Security Interest Was a Fraudulent Transfer

The next question is whether Gardiner's perfected security interest can be avoided as a fraudulent transfer pursuant to section 548 of the Bankruptcy Code. Gardiner argues that it is entitled to summary judgment in its favor on the trustee's

---

[4] Kapaa 382's financing statement filed with the California Secretary of State suffers from the acknowledged fatal flaw that it does not identify Lull. See Haw. Rev. Stat. § 490:9-502(a) and Cal. Com. Code § 9502(a)("a financing statement is sufficient only if it: (1) provides the name of the debtor . . . ."). Accordingly, Kapaa 382 does not rely on the financing statement in asserting that it had a security interest in the coin collection.

[5] Article 9 governs the transactions involving Kapaa 382 and Yamaguchi notwithstanding the fact that Lull purported to convey his interest in the coins by way of a "Bill of Sale" to Kapaa 382 and by way of an "assignment of proceeds" to Yamaguchi. "Article 9 of the UCC applies to any transaction intended to create a security interest[.]" Hawaii Broad. Co., Inc. v. Hawaii Radio, Inc., 82 Haw. 106, 116 (Haw.App. 1996). The undisputed facts show that the transfers to Kapaa 382 and Yamaguchi were intended as security for Lull's obligations to those creditors.

U.S. Bankruptcy Court - Hawaii   #07-90026   Dkt # 105   Filed 02/29/08   Page 14 of 24

cross-claim because the trustee cannot establish that the transfer was made with actual intent to hinder, delay or defraud creditors. Even if the trustee can establish actual intent, Gardiner further contends, the transfer cannot be avoided because Gardiner took the security interest for value and in good faith.

1.    *Standard*

Section 548(a) provides that the trustee may avoid:

(1)     . . . any transfer . . . of an interest of the debtor in property, or any obligation by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily —

(A)    made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred . . . .

Section 548(c) provides, however, that:

Except to the extent that a transfer or obligation voidable under this section is voidable under section 544, 545, or 547 of this title, a transferee or obligee of such a transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation.

-15-

2.    *Actual intent to hinder, delay or defraud*

Gardiner argues that the trustee does not have any evidence that Lull gave Gardiner its security interest with actual intent to hinder, delay or defraud his creditors.  In his cross-claim, the trustee asserts that the transfer was made as part of a Ponzi scheme whereby Lull solicited investors to make bridge or "flip" loans for real estate deals but actually used funds from new investors to pay earlier investors.

The trustee's insistence on the existence of a Ponzi scheme seems to stem from reported opinions holding that the fact that a transfer is made in furtherance of a Ponzi scheme is sufficient to establish actual intent under section 548(a)(1)(A) or its state law equivalents.  See, e.g., Hayes v. Palm Seedlings Partners (In re Agric. Research & Tech. Group), 916 F.2d 528, 536 (9th Cir. 1990)("the mere existence of a Ponzi scheme, which could be established by circumstantial evidence, has been found to fulfill the requirement of actual intent on the part of the debtor"); and Plotkin v. Pomona Valley Imports, Inc. (In re Cohen), 199 B.R. 709, 717 (B.A.P. 9th Cir. 1996)("Proof of a Ponzi scheme is sufficient to establish the Ponzi operator's actual intent to hinder, delay, or defraud creditors for  purposes of actually fraudulent transfers under Bankruptcy Code § 548(a)(1).").  Gardiner contends, however, that the trustee has no credible evidence that Lull was engaged in a Ponzi scheme.

"Generally, a Ponzi scheme is a phony investment plan in which monies

-16-

paid by later investors are used to pay artificially high returns to the initial investors, with the goal of attracting more investors." Alexander v. Compton (In re Bonham), 229 F.3d 750, 759 n. 1 (9th Cir. 2000). Proceeds are funneled "from new investors to previous investors in the guise of profits from the alleged business venture, thereby cultivating an illusion that a legitimate profit-making business opportunity exists and inducing further investment." Wyle v. C.H. Rider & Family (In re United Energy Corp.), 944 F.2d 589, 590 n. 1 (9th Cir. 1991).

The trustee argues that the evidence, including Lull's own testimony at his creditors' meeting and Fed. R. Bankr. P. 2004 examinations, shows that Lull used investors funds for payments to earlier investors instead of for a legitimate business purpose. The trustee offers, among other evidence, Rule 2004 deposition testimony from Lull stating that in 2003, investors' money "stopped being used for bridge loans and started going in to pay project costs and other things" including "debt servicing . . . to pay other clients." Tr., Rule 2004 Deposition of James Lull by Creditors Claire Mortimer and John Mortimer on September 6-7, 2007, p. 231, attached as Exhibit "K" to the Declaration of Cuyler Shaw in Support of Defendant Ronald K. Kotoshirodo's Opposition to Secured Creditor Gregg C. Gardiner Revocable Living Trust's Motion for Summary Judgment (Docket No. 87). The trustee identifies at least 10 creditors whose loans to Lull apparently went toward

-17-

paying Lull's past debts.

According to the trustee, the pleadings and proofs of claim filed in the bankruptcy case alone demonstrate that Lull was conducting a Ponzi scheme. Proofs of claim filed in the underlying bankruptcy case indicate that, by mid-2006, more than $25 million had been loaned to Lull for purported real estate investments. The trustee alleges that Lull has never been able to identify any legitimate underlying business for which he used the loan proceeds.

The evidence presented thus far does not establish that Lull was engaged in a Ponzi scheme. However, proof of the existence of a Ponzi scheme is but one method of establishing actual intent to hinder, delay or defraud under section 548(a)(1)(A). Actual intent also can be, and usually is, established by circumstantial evidence or "'inferences drawn from a course of conduct.'" Leonard v. Coolidge (In re National Audit Defense Network), 367 B.R. 207, 219-20 (Bankr. D. Nev. 2007)(quoting Mazer v. Jones (In re Jones), 184 B.R. 377, 385 (Bankr. D.N.M. 1995)).

Actual intent may be established, for example, where a transfer wears a sufficient number of the "badges of fraud" – the "recurring actions that historically have been associated with the actual intent to hinder, delay or defraud creditors." National Audit Defense Network, 367 B.R. at 220 (citing Twyne's Case, 3 Coke Rep.

-18-

80b, 76 Eng. Rep. 809 (Star Chamber 1601)). The Uniform Fraudulent Transfer Act provides the following non-exclusive list of badges of fraud:

(1) the transfer was to an insider;

(2) the debtor retained possession or control of the property transferred after the transfer;

(3) the transfer or obligation was disclosed or concealed;

(4) before the transfer or obligation was made or obligation was incurred, the debtor was sued or threatened with suit;

(5) the transfer was of substantially all of the debtor's assets;

(6) the debtor absconded;

(7) the debtor removed or concealed assets

(8) the value of the consideration received by the debtor was [not] reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) the debtor had transferred the essential assets of the business to a lienor who had transferred the assets to an insider of the debtor.

See Haw. Rev. Stat. § 651C-4(b). The list provides "neither a counting rule, nor a mathematical formula. No minimum number of factors tips the scales toward actual intent." Wolkowitz v. Beverly (In re Beverly), 374 B.R. 221, 236 (B.A.P. 9th Cir.

-19-

2007).

There remains a genuine issue of fact as to whether Lull transferred the blanket security interest to Gardiner with actual intent to hinder, delay or defraud Lull's creditors. Several legal theories are available for the litigation of the issue.

2.    *Section 548(c) exception*

Gardiner argues that summary judgment in its favor is appropriate even if a genuine issue of material fact exists as to actual intent, because the undisputed facts show that Gardiner took the security interest "for value and in good faith," thereby satisfying the exception to avoidance of a fraudulent transfer under section 548(c).

a.    Value

There is no question that Gardiner gave value for its security interest. Section 548(d)(2) specifically provides that "value" under section 548 "means property, or satisfaction or securing of a present or antecedent debt of the debtor . . . ." The $3.8 million loaned by Gardiner well exceeds the $453,302.26 in the interpleader fund.

-20-

b.     Good faith

Gardiner bears the burden of establishing that it received the transfer in good faith.  <u>Agricultural Research</u>, 916 F.2d at 535 (citing <u>Candor Diamond Corp. v. Rosenberg</u> (<u>In re Candor Diamond Corp.</u>), 76 B.R. 342, 351 (Bankr. S.D.N.Y. 1987)).

Gardiner trustee Gregg Gardiner's affidavit filed in support of the instant motion states that, "[a]t the time the [Lull] proposed granting the Gardiner Trust a security interest in his assets, the Gardiner Trust had no actual or constructive knowledge of any improper conduct being performed by [Lull] or the alleged 'Ponzi' scheme as it is being proffered by the Trustee."  Affidavit of Gregg Gardiner as Trustee of the Gregg C. Gardiner Revocable Trust, ¶ 11 (Docket No. 64).

Gardiner's disavowal of any knowledge of a Ponzi scheme is insufficient to demonstrate that, as a matter of law, it took the blanket security interest in good faith.  The current record does not indicate that Gardiner was aware of the full extent of Lull's dealings with other investors.  In this circuit, however, the good faith standard under section 548(c) features an objective component, wherein "a transferee's knowledge of, *or reasonable cause to suspect*, the transferor's insolvency may be inconsistent with good faith."  <u>Gill v. Maddalena</u> (<u>In re Maddalena</u>), 176 B.R. 551, 556 (Bankr. C.D. Cal. 1995)(citing 4 <u>Collier on Bankruptcy</u> ¶ 548.07[3], 548-81 (15th ed. 1990)).  (Emphasis added.)  "In cases involving actual fraud by the debtor-

-21-

transferor, the courts define 'good faith' required by Section 548(c) to mean that viewed objectively, the transferee neither knew nor should have known of the fraudulent nature of the transfer." 176 B.R. at 555 (citing <u>Agricultural Research</u>, 916 F.2d at 535). Under the objective component of the good faith standard, "Facts sufficient to warrant a finding of inquiry notice are also sufficient to defeat the good faith that is essential to the § 548(c) safe harbor." <u>Cohen</u>, 199 B.R. at 720.

      The trustee notes that at the time Gardiner took its security interest, Gregg Gardiner had recently learned that another investor, Jon Anderton, was owed a delinquent debt of $5 million from Lull and had hired an attorney to attempt collection. The trustee believes he can prove at trial that Gregg Gardiner and Anderton discovered undisclosed overlaps in the names of borrowers to whom the funds received from Gardiner and Anderton had supposedly been loaned.

      The trustee also notes that Gardiner obviously was aware of substantial delinquent debt owing to it and that a partial payment check given by Lull to Gardiner had been dishonored by Lull's bank. Gardiner therefore knew that it was taking a general transfer – a security interest in all of Lull's personal property – at a time when Lull had at least two creditors with multi-million dollar claims, Gardiner and Anderton. The "purported transfer of all or substantially all of the debtor's property" is a recognized badge of fraud. <u>Acequia, Inc. v. Clinton</u> (<u>In re Acequia,</u>

-22-

Inc.), 34 F.3d 800, 806 (9th Cir. 1994). See also, Haw. Rev. Stat. § 651C-4(b), supra.

The trustee has presented sufficient evidence to create a genuine issue of fact as to whether the available objective facts known to Gardiner at the time of the transfer put Gardiner on inquiry notice of Lull's insolvency and allegedly fraudulent activity. Therefore, Gardiner is not entitled to a determination that he took the transfer in good faith.


## VI.  CONCLUSION

Gardiner's motion for summary judgment will be granted in part and denied in part.

The motion will be granted as to Gardiner having perfected a security interest in Lull's personal property. The only challenge on this point is the suggestion by Kapaa 382 that the consigned coin collection is "money", requiring possession, rather than the filing of a UCC financing statement, for perfection of the security interest. Case law and the official comments to the UCC make it clear that numismatic coins, with a market value far in excess of the face value of the coins, are not merely "money", but constitute "goods", in which a security interest is perfected by the recording of a financing statement where the goods are in possession of another party. Gardiner has taken all necessary steps for the perfection of its security

U.S. Bankruptcy Court - Hawaii   #07-90026   Dkt # 105   Filed  02/29/08   Page 23 of 24

interest in Lull's personal property, and has demonstrated that its security interest in the auction proceeds has priority over the asserted interests of co-defendants Kapaa 382 and Yamaguchi.

The motion will be denied, to the extent that it seeks a ruling that Lull's conveyance to Gardiner of the security interest cannot be avoided by the trustee in bankruptcy as a fraudulent conveyance. The trustee has raised genuine issues of material fact concerning: (1) whether or not giving the security interest to Gardiner was done with actual intent, on Lull's part, to hinder, delay, or defraud his creditors; and (2) if there was a fraudulent conveyance, whether it was received by Gardiner in "good faith", which would entitle Gardiner to the protection of section 548(c).

The court makes no determination at this time as to whether Gardiner has an allowed claim in the amount it asserts.

Pursuant to the foregoing discussion, an order will be entered granting in part and denying in part Gardiner's motion for summary judgment.


DATED:  Honolulu, Hawaii, February 29, 2008

Lloyd King
United States Bankruptcy Judge

-24-